UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ETHAN GWIN,

        Plaintiff,

v.

TARGET CORPORATION,

        Defendant.

Case No.  C-12-05995 JCS

**ORDER DENYING TARGET CORPORATION'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. No. 41

## I.  INTRODUCTION

This action arises out of Plaintiff Ethan Gwin's termination as a Senior Asset Protection Specialist by Defendant Target Corporation ("Target").  Gwin contends he was terminated because he filed claims for Workers' Compensation after he was injured on the job.  Two claims remain in the case:  1) violation of California Labor Code § 98.6; and 2) wrongful termination in violation of public policy.  Target brings a Motion for Summary Judgment, or Alternatively, for Partial Summary Judgment ("Motion").   A hearing on the Motion was held on Friday, February 14, 2014 at 9:30 a.m.  For the reasons stated below, the Motion is DENIED.[1]

## II.  BACKGROUND

### A.  Factual Background

#### 1.  Target's Assets Protection Department: Policies and Practices

Target maintains an Assets Protection Department, which is staffed by team members who work as Target Protection Specialists ("TPS") and Senior Target Protection Specialists ("Senior TPS").  Joint Statement of the Material Facts Regarding Defendant Target Corporation's Motion

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   for Summary Judgment or, Alternatively Motion for Partial Summary Judgment ("JSUF"), ¶ 1.

2   TPS and Senior TPS team members' job duties and responsibilities include minimizing the loss of

3   merchandise by theft and fraud ("loss prevention").  *Id.*, ¶ 4. Their overall goal is to ensure that the

4   location where they work is as safe and secure as possible for both employees and guests.  *Id.*, ¶ 2.

5       To become a Senior TPS, an Assets Protection Department employee is required to

6   complete a certification program, which consists of two phases.  *Id.*, ¶ 17.   The first phase of the

7   program is completed on-line while the second phase is a one-day in-person class.  *Id.*  Among

8   the topics covered in Target's Senior TPS certification training are instruction on Target's

9   authorized non-violent intervention techniques and Target's requirements and authorized methods

10  for when and how to conduct an apprehension of a suspected shoplifter.  *Id.*

11      Target's procedures for loss prevention are set forth in its written Asset Protection

12  Directives ("AP Directives").  *Id.* ¶ 5; *see also* Declaration of Benjamin A. Emmert in Support of

13  Target  Corporation's Motion for Summary Judgment or, Alternatively, Partial Summary

14  Judgment to Plaintiff's First Amended Complaint ("Emmert Decl."), Ex. M.  Loss prevention

15  techniques include Productive Merchandise Recovery ("PMR"), Merchandise Receipt Checks and

16  External Apprehensions. *Id.* ¶ 6.  Only Senior TPS team members are authorized, in the proper

17  circumstances, to apprehend suspected shoplifters.  *Id.* ¶  3.  The AP Directives also address

18  proper surveillance techniques and documentation requirements.  *Id.*  ¶ 20.  Under the AP

19  Directives, violations of Target's policies are to be "handled in accordance with the applicable

20  counseling and corrective action policy." *Id.* ¶ 21.

21      Target's policies governing apprehension are set forth in the AP Directive entitled, "Assets

22  Protection Directive:  External Apprehension" (hereinafter, "Apprehension Directive").

23  Declaration of Don Hanlon in Support of Target Corporation's Motion for Summary Judgment or,

24  Alternatively, Partial Summary Judgment to Plaintiff's First Amended Complaint ("Hanlon

25  Decl."), Ex. A at TARGET 0307.  In addition to the requirement that the TPS have the proper

26  certification to conduct an apprehension (discussed above), this directive provided, *inter alia*, that

27  "[s]earches of a subject's personal possessions for evidence are not allowed unless the subject

28  initiates  the search or requests an AP team member to inspect their possessions."  *Id.*  The

directive further provides that an apprehension may be made only if the following "steps" are observed:

> 1. **Initiation of Observation**: The subject must be seen entering the store or area without possession of Target Merchandise.
> 2. **Selection**: The subject must be observed selecting Target merchandise for the display location.
> 3. **Concealment**: The subject must be observed concealing the merchandise, or the AP team member must have NO reasonable doubt based on observations that the merchandise has been concealed by the subject.
>     a. If the merchandise is not actually concealed, it must be exposed as the subject exits or attempts to exit the store.
> 4. **Maintain Observation**: The AP team member must maintain sufficient surveillance of the subject in order to know the location of the merchandise and ensure the subject does not discard the merchandise.
>     a. A Productive Merchandise Recovery (PMR) shall be attempted if surveillance is broken for any reason, or the AP team member cannot maintain sufficient surveillance. (see PMR Directive)
> 5. **Failure to Pay for Merchandise/Exiting the Store**: AP team member(s) must observe the subject attempt to exit the store without paying for the merchandise.

*Id*. at TARGET 0308.

Guidelines for conducting a PMR are set forth in the AP Directive entitled "Productive Merchandise Recovery (PMR)" (hereinafter, "PMR Directive"). The PMR Directive states that "a PMR is the preferred tactic to prevent theft activity." *Id*. at TARGET 0300. The PMR Directive provides that a PMR may be conducted only if "an AP team member witnesses a subject conceal merchandise" and allows an AP member to "make their presence known to the subject, on the sales floor, in an attempt to get the subject to discard the item." *Id*. In conducting a PMR the team member is not, however, permitted to "[a]sk the subject to return the concealed merchandise or make any accusations of theft." *Id*.

Target's Team Member Handbook emphasizes that it seeks to make Target a safe place to shop and to work. Emmert Decl., Ex. J at 37-41; *id*., Ex. K at 48-52.

Target's policies regarding corrective actions and termination are set forth in a document entitled "Counseling and Corrective Action." Declaration of Sheila A. Reid in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment or, Alternatively, for Partial Summary Judgment ("Reid Decl."), Ex. 1. At the outset, the document states as follows:

3

United States District Court
Northern District of California

> This policy establishes broad guidelines designed to achieve fair and equitable treatment for all team members. It does not, either by itself or in conjunction with any other documents, policy, practice, procedure or verbal statement, create an employment contract, express or implied, or define the employment relationship or limit how that relationship may end. Team members are employed at will, meaning that they or the company can end the employment relationship anytime, for any reason. This policy does not alter the at will status of any team member. At will status can only be altered with the advance approval of the Human Resources, Executive Vice President.

*Id*. at TARGET0362. The Counseling and Corrective Action policy distinguishes between "unsatisfactory performance" and "unacceptable conduct." *Id*. at TARGET0363. "Unsatisfactory performance" is defined as "the failure or inability of a team member to satisfactorily perform assigned duties to standards set by" Target. *Id*. "Unacceptable conduct" is defined as "conduct or behavior of a team member that is unacceptable (e.g. theft, harassment, failure to follow instructions) that may or may not be related to the team member's job duties." *Id*. For both unsatisfactory performance and unacceptable conduct, the progressive actions that may be taken are 1) Counsel, 2) Final Warning, and 3) Termination. *Id*.

The progression of corrective action for unacceptable conduct "depends on the type of conduct involved." *Id*. In particular:

> Corrective Action for "Minor Offense" misconduct is a Counseling. Corrective Action for "Serious Offense" misconduct, or for conduct for which a Counseling was previously issued, is a Final Warning. Corrective Action for "Gross Misconduct" or for conduct for which a Final Warning was previously issued is Termination . . . .

*Id*.

### 2. Management Structure: Antioch Store and District Level

The Target management structure at the store level consists of Store Managers, and under the store manager, Executive Team Leaders ("ETL") who oversee various areas of the store. Reid Decl., Ex. 10 (Hanlon Dep.) at 16. During Gwin's employment with Target, Robin Cribbs was the Store Manager of the Antioch Store and Christine Bliss was the Executive Team Lead in Assets Protection. *Id*. at 16-17. In addition to reporting to store manager Robin Cribbs, Christine Bliss

4

1   also reported to a district level Assets Protection Business Partner,[2] Shavaun Burse.  *Id*. at 18.

2   Heather McCoy was the Human Resources Representative at the Antioch store when Gwin was

3   employed there.  *Id*. at 17.  McCoy reported to the Store Manager, Robin Cribbs, and to HR

4   Business Partner Laura Patajo, who was a district level HR Representative.  *Id*. at 17-18.   Emily

5   Holliday was an Employee Relations consultant.   Reid Decl., Ex.  6 (Holliday Dep.) at 16.

### 3.  Gwin's Employment With Target

6

7          On April 3, 2009, Gwin applied for employment at Target for positions it had open at the

8   Antioch store because that store was close to his home.  JSUF ¶ 8.   Although he applied to work

9   as a sales associate, cashier or cart attendant – the positions that were listed as being open – the

10  individual who interviewed Gwin, apparently noticing that he had graduated from the Contra

11  Costa Sheriff's Department Police Officers Standards Training ("POST"), raised the possibility of

12  working in Asset Protection.  *Id*., ¶¶ 10, 12.  Gwin testified that he responded by saying, "that

13  sounds cool, so they went ahead and interviewed [him] for that."  Emmert Decl., Ex. 1 (Gwin

14  Dep.) at 20.  According to Gwin, working in Asset Protection appealed to him because it would be

15  "the same type of work as police do" to the extent he could "help the people where they work . . .

16  at the store level" just as police "help the people" of a whole city.  *Id*. at 21.

17         Target hired Gwin on May 6, 2009 to work in the Assets Protection Department at its

18  location in Antioch.  *Id*.  ¶¶ 8, 12-13.  He was initially hired as a part-time employee but soon was

19  made a full-time employee.  *Id*. ¶¶ 24-25.   He was paid on an hourly basis, starting at a rate of

20  $14.00/hour.  *Id*. ¶¶  30-31.  On being hired, Gwin went through Target's new team member

21  orientation .  *Id*. ¶ 14.  Gwin also completed both phases (on-line and in-person) of Target's Senior

22  TPS certification program.  *Id.* ¶¶ 15, 19.  In the class, he was trained in non-violent intervention

23  ("NVI"), including different tactics on approaching people, how to correctly stop them, and how

24  to put them in control holds, as well as handcuffing.  *Id*. ¶ 18.

25         Gwin had to review Target's Assets Protection Directives on a regular basis, either

26  annually or semiannually.  *Id*. ¶ 22; *see also* Emmert Decl., Ex. A (Gwin Depo.) at 29.  He

27

28  _____

[2] Target's personnel at the District level are referred to as "Business Partners."  *Id*. at 18.

United States District Court
Northern District of California

testified he was recognized as being very familiar with the Target's online Assets Protection Directives training and he would be asked to train other Asset Protection employees on their requirements. *Id.* ¶ 23.

While he was employed at Target, Gwin received annual performance reviews. *Id.* ¶ 26; *see also* Emmert Decl., Exs. R (May 15, 2010 Review ("2010 Review")) and S (May 10, 2011 Review ("2011 Review")).  These reviews were completed by Gwin's supervisor, Christine Bliss, and approved by Heather McCoy, the Human Resources employee at the Antioch store.  JSUF ¶ 29;  Emmert Decl., Exs. R & S.  On both reviews, Gwin received an overall score of "Excellent." JSUF ¶ 27;  Emmert Decl., Exs. R & S.  The 2010 Review included the following comments:

- "You educate team members on a daily basis not only at huddles but one on one."
- "In 2009 you documented 12 KTRs ($7,857.88) and partnered with Investigations to get Investigations Specialist deployed to our store. You recovered $4,697.92 in merchandise by making 2 apprehensions and 19 PMRs, leading the Team in overall recoveries!"
- "You lead the Team in reports documented in TCM, your reports are entered in a timely manner and your written communication is fantastic."

Emmert Decl., Ex. R.  In the 2011 Review, Bliss complimented Gwin for being a "[p]eer trainer who trained multiple members of the AP team throughout the District" and as a person to whom "ETL-APs reach out . . .when a member of their Team is in need of additional training or guidance."  *Id.*, Ex. S.  The review continues:

> Ethan I feel so very lucky to have you on my Team sir. In 2010 you put [the Antioch store] on the map with consistently green recovery rates!  Your drive for theft investigation and resolution has inspired not only your store peers but your district peers as well.

*Id.*  Following both the 2010 and 2011 Reviews Gwin was given a merit increase in his hourly pay rate.  Emmert Decl., Exs. R & S.

### 4.  January 12, 2010 Incident and Aftermath

On January 12, 2010, Plaintiff was at work when he saw a guest who he believed was attempting to steal electronic merchandise.  JSUF ¶ 32. The subject had placed some electronic

6

merchandise in a shopping cart then moved the cart to a clothing aisle where he left it as he went out into the parking lot and talked with another person. *Id.* ¶ 33.  The person the subject was talking to was near a vehicle. *Id.* ¶ 34. That person opened the trunk, started the car, and got inside. *Id.*  The subject then reentered the store, retrieved the shopping cart full of merchandise and proceeded to attempt to exit the store without paying for the merchandise. *Id.* ¶ 35.   In his deposition Gwin described the subsequent events as follows:

> I contacted the subject at the door, at [which] point he pushed the shopping cart into me, causing me to fall down and dislocate my shoulder.  I was unaware that I dislocated my shoulder at that time, so I proceeded with the apprehension of the subject, at [which] point my arm got locked up above my head, and the subject was released.

Emmert Decl., Ex. A (Gwin Dep.) at 45-46. According to Gwin, he did not apprehend the subject in the end because he realized he would need to use a greater amount of force, which he felt was "not worthwhile." *Id.* at 47-48.

Plaintiff then went back inside the store and told the manager on duty he was injured, consistent with Target's policy.  JSUF ¶¶ 40-41;  *see also* Emmert Decl., Ex. A (Gwin dep.) at 91-93 (testifying that after the January 12, 2010 incident he told the manager on duty about his injury and the manager walked him through the requirements for filing a Workers' Compensation claim); JSUF  ¶ 65 (Target walked Plaintiff through the Workers' Compensation benefits process").  Plaintiff immediately left work and sought medical attention.  JSUF ¶ 40.  He went to Sand Creek Kaiser, where he was put under anesthesia while his shoulder was relocated.  *Id.*  Plaintiff subsequently filed a Workers' Compensation claim and received Workers' Compensation benefits for his injury.  *Id.* ¶¶ 42-43.[3]  According to Gwin, "[he] never heard anything from [his] supervisors or anyone else at Target that [he] had not properly performed [his] duties during that incident or that [he] had violated any [AP] Directives."  Declaration of Plaintiff Ethan Gwin in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment or, Alternatively, for Partial Summary Judgment ("Gwin Decl."), ¶ 3. Gwin further states that he "received no

---

[3] At oral argument, Target did not dispute that when an employee files a claim for Worker's Compensation it goes to Human Resources.  It also did not dispute that the employee's manager receives notice that a claim has been filed as well.

United States District Court
Northern District of California

counseling concerning [his] performance of [his] duties during the January 12, 2010 incident." *Id.*

As a result of Gwin's January 12, 2010, injury, his doctor placed him on work restrictions. JSUF ¶ 44. Between about January 12, 2010, and February 11, 2010, Gwin was under his doctor's order that he wear a shoulder immobilizer twenty-four hours a day, seven days a week. *Id.*, ¶ 45. On about February 11, 2010, Gwin's doctor removed the requirement that he use the shoulder immobilizer but kept the restriction against any elevation or external rotation of his arm. *Id.* ¶ 46. After Gwin's doctor removed the shoulder immobilizer requirement from his restrictions, Gwin was given another immobilizer that gave him some flexibility to move the lower part of his arm, but still not his shoulder. *Id.* ¶ 47. The restriction against any elevation or external rotation of his injured arm remained in place until April 14, 2010, when Plaintiff was cleared to return to work without restriction. *Id.* ¶ 48.

Plaintiff contends when he returned to work after the January 12, 2010 injury he began to be treated differently and less favorably than prior to the injury, stating as follows:

> 6. When I returned to work with my shoulder restrictions, Target, instead of allowing me to perform my regular duties as I was able, stuck me in the back of the store in an area under construction at a door that was rarely used and made me "guard" that door for my full eight-hour shifts. This went on for several weeks. Target guests were not allowed in the area and few people came in and out after the early morning. The door could close and could be manually locked and unlocked. The door could also be viewed from the camera/video room. It was not a location that required that a Senior Target Protection Specialist or even a regular Target Protection Specialist be assigned full-time or even-part time. The assignment was demeaning and was in effect a demotion, because it was an assignment that did not require an Asset Protections employee. Any Target team member could perform it, and in fact, after I was taken off that assignment, Target assigned two sales associates (not Asset Protection personnel), who were not in good standing, to sit at the door. One was being investigated for doing "pass-offs" of cash with his friends at the register. I was involved in that investigation. The other one was rumored to not be a hard worker and I had . . . heard they were looking to get him out of the department he was working in. Assigning me to the construction area door was clearly a message that I was all of a sudden held in disfavor and being punished. Prior to that time, I had received only positive evaluations and feedback about my performance from my superiors. The only thing that had happened was that I had suffered a work-related injury and made a workers' compensation.
>
> 7. I was taken off the back door assignment to perform my usual job duties, except apprehensions, while I was still under the work restrictions and while the back door was still under construction. In other words, Target had not assigned me to the back door on the basis of my work

8

restrictions.

8. Prior to making my workers' compensation claim for my shoulder injury, my work assignments were pretty open. There were only a few set tasks I was required to do throughout the day. Usually, I was to spend up to 50% of the day at the front door, and the other time performing parking lot patrols and walk-throughs of high theft departments. I was able to use the video camera system to surveil people if they met any criteria that might lead him to think they were going to steal merchandise. I was also able to take bathroom breaks without having to tell anyone.

9. After I was assigned away from the back door, and even after I was released from my medical restrictions, I was assigned to spend 80% of my work time at the front doors. The requirement to be at the front door 80% of the time was not enforced against anyone else. I would often shop or stop by the store on my days off and would see the other TPS's walking around talking to associates in electronics or at the fitting room. In looking at video I was asked to review, I kept a tally on how much time I spent at the front door compared to the TPS on the video, and the TPS spent about half his day there while I was still being forced to spend 80% of my day there.

10. After January 12, 2010, if I had to leave my post at the front door to use the rest rooms, I had to radio into my supervisor and tell her that [I] was taking a bathroom break. As far as [I] can recall, I was the only TPS that was being held accountable to report when I was leaving the front door. I never heard anyone else on the walkie-talkie reporting they were taking their bathroom break. On some occasions when I had to radio my supervisor to take a bathroom break, I observed other TPS' leaving the bathroom and never heard it on my walkie-talkie.

11. My access to the video surveillance office also changed after my January 2010 injury. Before, if I needed to take a sit down break for five minutes from standing at the door, I could spend time on the camera system conducting surveillance. After the January 2010 injury, Target all of sudden no longer wanted me in the office; they wanted me at the front door. Unless I had a specific reason to go to the office they did not want me in there. I did not see any other TPS getting restricted from the office.

Gwin Decl., ¶¶ 6-11.

### 5. January 4, 2011 Incident[4]

On January 4, 2011, while conducting live video surveillance, Gwin watched a subject as she ripped a cell phone off a locking peg and placed the phone in her shopping cart. JSUF ¶ 59. Gwin continued to watch the subject as she circumvented the theft prevention locking bolt on a

---

[4] In the JSUF, this incident is described as having occurred on both January 4, 2011 and January 11, 2011. *See* JSUF ¶¶ 58-59, 64. The time stamp on the video surveillance footage indicates that it occurred on January 4, 2011. *See* Emmert Decl., Ex. GG.

United States District Court
Northern District of California

1    television and placed it and a surround sound speaker system in her shopping cart.  *Id.* ¶ 60.  The

2    subject then began to make her way with the merchandise to the store's front entrance door and

3    exit without paying for it.  *Id.* ¶ 61.

4         Gwin placed the suspect in handcuffs and arrested her for shoplifting. *Id.* ¶ 62.  During the

5    apprehension of the subject, the subject bit Gwin's hand. *Id.*, ¶ 63. Gwin reported that he had been

6    injured immediately after the injury occurred as required by Target's policies.  *Id.*, ¶ 64.   Gwin

7    also notified the police, who booked the subject.  Emmert Decl., Ex. A (Gwin Dep.) at 91.  As

8    soon as the police took the subject away Gwin went to the hospital, concerned about a possible

9    HIV infection.  *Id.*  There, he received shots and had the wound cleaned.  *Id.*  Subsequently, Gwin

10   filed a claim for Workers' Compensation and received Workers' Compensation benefits.  *Id.* at

11   91-92.  According to Gwin, "[n]o one advised [him] that he had not performed [his] duties during

12   the January 4, 2011, apprehension in accordance with the AP Directives under the circumstances,

13   until [he] was later given a written Corrective Action in August 2011 and asked to back date it."

14   Gwin Decl., ¶ 13.

15        Gwin further asserts that following this second injury he was again subjected to retaliation

16   for filing another Workers' Compensation claim, stating as follows:

17
18          14. Following my sustaining the January 4, 2011, work-related
            injury to my hand and reporting it, Target continued with the
19          hostility and retaliation they perpetrated against me since the
            January 2010 injury. My report writing became much more
20          scrutinized than ever before. I started getting asked about specific
            details, so I knew all of the videos I was asked to burn of my
21          incidents were being reviewed when other TPS videos were not
            being reviewed. I was told to spend 90% of my time stationed at the
22          front door, which seemed to be video reviewed, too. I continued to
            be required to report when I would be away from the front door for a
23          bathroom break. I was made to perform a parking lot patrol fifteen
            minutes each hour, while other TPS' were not, which made standing
24          by the door 90% of the time impossible, and left me no time to
            perform the other tasks I used to perform, such as walk-throughs of
25          high theft departments and video surveillance. It was degrading and
            humiliating. Target also refused to replace my uniform pants, which
26          had been ripped in the January 4, 2011, apprehension, so I had to
            wear non-uniform pants I purchased myself, just to perform my job.
27          Whereas before, when I would make an apprehension I would hear
            from my superiors, "Good job, way to go," now they would find
28          ways to criticize my performance, even though the apprehension
            was made in accordance with Target policies and directives.

1    Gwin Decl., ¶ 14.

2        **6.   Conversation Between Bliss and Gwin**

3        Gwin testified that shortly after the January 4, 2011 injury, Bliss, pulled him aside and

4    warned him that he "really [had] to keep a low profile."  Emmert Decl., Ex. A (Gwin Dep.) at 96.

5    Noting that he was paraphrasing, Gwin testified that Christine Bliss said: "They're watching

6    everything you do.  Do not get injured again, because they're trying to find a reason to get rid of

7    you."  *Id.*  Gwin further states in his declaration:

8            Ms. Bliss said that "some of this is being passed down from district
             to me" and "I don't have a say-so on some of this stuff." I believe
9            Ms. Bliss said it was coming from her manager, Shavaun Burse. Ms.
             Bliss also mentioned not to trust Don Hanlon, because he worked
10           very closely with Ms. Burse.

11   Gwin Decl., ¶ 16.   According to Gwin, Bliss "seemed a little bit upset" when she pulled him

12   aside.  Emmert Decl., Ex. A (Gwin Dep.) at 96-97.  He further testifies that she asked him to leave

13   the store, telling him she "[had] a feeling they might even be audio-recording" and that he and

14   Bliss walked down about 40 feet from the Target exit and talked outside an Indian restaurant.  *Id.*

15   at 97.  According to Gwin, this conversation occurred "immediately following [his] second

16   injury."  *Id.* at 102.[5]

17       **7.   Conversations Between Bliss and McCoy**

18       Heather McCoy testified at her deposition that she had "multiple conversations" at

19   different times with Christine Bliss about whether Gwin should be put on corrective action.

20   Emmert Decl., Ex. F at 27.  McCoy testified that Bliss had spoken to her to "express concern

21   because on two different occasions Ethan had suffered injuries while apprehending a subject."

22   Reid Decl., Ex. 4 (McCoy Dep.) at 99.  McCoy testified that she and Bliss discussed whether

23   Gwin should receive additional training emphasizing safety.  *Id.*

24

25
     ─────────────────────
26   [5] Target does not object to Gwin's testimony regarding the statements of Christine Bliss.  To the
     contrary, it cites that testimony as an admission by Gwin that "Christine Bliss [] specifically
27   warned Plaintiff about engaging in any further conduct that violated Target's AP Directives."  *See*
     Motion at 15.  Thus any possible objection to this testimony as hearsay is waived.  In any event,
28   Bliss's testimony is likely admissible as a vicarious admission under Rule 801(d)(2)(D) of the
     Federal Rules of Evidence.

United States District Court
Northern District of California

**8.   The August 11, 2011 Incident**

On August 11, 2011, Gwin conducted what he described in his subsequent written report as a PMR involving the suspected theft of baby formula ("baby formula incident").  JSUF ¶ 67.  Gwin contends his conduct was consistent with Target's AP Directives but Target disagrees.  *See* Gwin Decl., ¶ 19;  Motion at 16-17.  Gwin describes the incident as follows:

> 18.  On August 11, 2011, I was at work stationed at the entrance of Target's Antioch location when I saw an individual carrying an H&M shopping bag enter the store. This caught my eye, because there was no H&M store in the shopping center. I radioed Kyle Andrews, the other TPS on duty who was working in the video room, and asked that he maintain video surveillance on the subject. A short time later, the TPS in the video room notified me that he saw the subject place several containers of baby formula in her bag. Because Kyle was not a certified TPS and therefore could not participate in an apprehension by using the video system, I went to the area where the subject was seen to investigate. I was unable to locate the subject when I first arrived at the location. The subject suddenly came out from nowhere and approached me and began yelling profanities at me. Because of her behavior, which was disruptive to Target guests, I told her that she was getting trespassed from the store and began escorting her out. As we were walking to the front of the store, the subject ducked into an aisle and pulled out two baby formula containers, tossed them onto a fixture, and asked me something to the effect of, "Are you going to arrest me or not?" I responded by stating, as I was trained, that "Target allows me to arrest anybody that walks out with unpaid merchandise. That being said, if you have any questions about our policies, I'd be more than happy to get a manager, but for now, you need to leave the premises." The subject headed toward the entrance door to exit and, as they approached the door, a woman with a shopping cart came into the store through the door. I then moved to the right to avoid the shopping cart. The subject then reached into her bag and pulled out one additional baby formula can and handed it to me. The subject asked me, "Do you want to look in my f-ing bag" to which I responded, "That's up to you." She opened her bag and I peered in. I never touched the subject or her belongings. The subject then walked away out of the store.

Gwin Decl., ¶ 18. Target challenges Gwin's version of the incident, asserting, *inter alia*, that Gwin blocked the subject just outside the doorway and prevented her from leaving.  Motion at 17 (citing Emmert Decl., Ex. A (Gwin Dep.) at 151-152; *id.*, Ex. HH (surveillance video)).

Plaintiff timely prepared a report of the baby formula incident.  JSUF ¶ 67; *see also* Emmert Decl., Ex. Y (Gwin's summary of incident).   In the report, he states, in part, as follows:

> On the date of 08/07/2010 at approximately 1015 hours while

12

> standing at the West Side entrance doors I noticed a Guest . . . enter through the West side entrance doors.  The Subject drew my attention due to holding a large H & M bag in her hand, there is no H & M store in the shopping center where Target is located making this seem out of place.  I immediately contacted Kyle Andrews . . . the other Target Protection Specialist on duty and had him [begin] Live Video Surveillance as I maintained physical surveillance.
>
> The Subject made her way to the Baby Formula Department at [which] point she was seen selecting and concealing sic (6) Enfamil containers.  At this point the Subject spotted me and immediately dumped two (2) of the containers.  The Subject contacted me and asked why I was following her at [which] point I replied that I had been asked to check on the Baby Formula but if she had any further questions she could talk to my Leader on Duty.
>
> The Subject left the Baby Department at this point and made her way to the West side doors, on the way she was seen going down Aisle C18  where she dumped an additional two (2) Enfamil formula before she continued to the exit.  I followed at a close distance to make my presence known at [which] point the Subject asked me if I would arrest her if she exited with merchandise which I replied that my job here was to make sure the merchandise didn't leave the store unpaid but any further questions could be directed to my Leader on Duty.  The Subject discarded one (1) Enfamil container then exited the store through the West side entrance doors.
>
> The Subject was last seen getting into a Red Sedan before leaving the parking lot . . . .

Emmert Decl., Ex. Y.

Immediately after the baby formula incident, Gwin notified Target's Senior Investigator, Don Hanlon, of the incident.  JSUF ¶ 68.  Baby formula was a high alert item and Hanlon was involved in an on-going investigation of the theft of baby formula by organized theft rings.  *Id.* ¶ 69.  Gwin testified that Hanlon asked him why he had not arrested the subject.  Emmert Decl., Ex. A (Gwin Dep.) at 152.  According to Gwin, he told Hanlon that he did not have two of the required steps to conduct an apprehension.  *Id.*  According to Gwin, he also told Hanlon that the merchandise was worth less than $100 and Target had previously instructed Gwin that he was not authorized to conduct an apprehension unless the value of the merchandise exceeded $100.  *Id.*  Gwin testified that Hanlon told him he should have conducted an apprehension anyway.  *Id.*  Gwin testified that Hanlon told him to write the incident up as a PMR.  *Id.*  According to Gwin, he told his manager, Christine Bliss, about the incident when she arrived for her shift several hours later.  *Id.* 152.  Gwin testified that Christine Bliss reviewed the surveillance video at that time and

13

1    "seemed to be fine with it."  *Id.*

2         **9.  Gwin's Termination**

3         According to Gwin, "in our around August 2011, I was handed a written 'Corrective

4    Action' to sign for the January 2011, apprehension by Ms. Bliss or Heather McCoy, and asked to

5    back date the document to [January 4, 2011]."[6] Gwin Decl., ¶ 17.  Gwin states that he "complied

6    with the request because [he] was intimidated by the whole process at that point as [he] had

7    already had the conversation with Ms. Bliss saying that everything [he] was doing was being

8    watched" and he "did not feel [he] had any choice because [he]wanted and needed to keep [his]

9    job."  *Id.*   The Corrective Action is for "Unacceptable Conduct" and is designated "Final."

10   Emmert Decl., Ex. X.  It is dated January 4, 2011 and is signed by Gwin, McCoy and Bliss.  *Id.*  It

11   states, in part, as follows:

12        **Policy:  Negligent Conduct**

13        The failure of a team member to use ordinary and reasonable care in
     the performance of his or her work or work-related duties, whether
14   or not the conduct occurs on company premises.  Negligent conduct
     also includes, but is not limited to, such conduct as:
15

16        Engaging in conduct that results in minor injury to a person,
     significant damage to property or financial loss to the company.

17        **Violation**

18        Ethan, on 1/04/2011 you missed an opportunity to disengage during
     an apprehension which resulted in an injury to yourself.
19

20        **Expected Conduct**

21        Ethan, please approach every situation with Safety (that of yours and
     others involved) as your first priority.   Review the online Non
22   Violent Intervention lesson as a refresher.  Ensure your conduct is
     within the AP Directives as well as all company policies and/or
23   procedures.

24        **Consequences**

25        If you engage in further unacceptable conduct within the subsequent
     12 months following this issuance the next corrective action step

26

27   _____
     [6] Plaintiff's declaration refers to the incident as having occurred on January 14, 2011.  As stated
     above, the incident occurred on January 4, 2011.  The Corrective Action, likewise, is back dated to
28   January 4, 2011.  Emmert Decl., Ex. X.  Therefore, the Court finds that Plaintiff intended to refer
     to January 4 and that the reference to January 14 is a typographical error.

United States District Court
Northern District of California

will result in termination

*Id.*

Around the same time, Target initiated an investigation of Gwin's handling of the baby formula incident.  JSUF ¶ 71. The investigation was launched after Hanlon notified an Assets Protection Business Partner using Target's hotline that the incident should be reviewed based on his belief that Gwin had violated the PMR and Apprehension AP Directives.   Emmert Decl., Ex. B (Hanlon Dep.) at 47-52.  Hanlon had reviewed the video footage of the baby formula incident within an hour of its occurrence. *Id*. at 47.   According to Hanlon, the basis for his belief that Gwin had violated the AP Directives – and what he told the Business Partner when he recommended the incident be reviewed – was as follows:

> Well, from my observations, it was the continued contact, the verbal conversation that led them to going into the cosmetic aisle, and then the recovery of product, which is highly irregular, and then what looked like an apprehension at the door, but no subject was taken back to the office.  He just let her go.  The two don't normally go together.

Reid Decl., Ex. 10 (Hanlon Dep.) at 62.

Following Hanlon's call to district level management, Heather McCoy, the Human Resources Representative at the Antioch store, became involved.  Emmert Decl., Ex. F (McCoy Dep.) at 45.  McCoy contacted Laura Patajo, the district-level HR Business Partner, and Patajo, in turn, contacted Emily Holliday, of the Employee Relations Department (at the district level) for assistance in investigating the incident. *Id*. at 111;  *see also id.,* Ex. D (Patajo Decl.) at 62.  Patajo asked Holliday to investigate the incident and make recommendations.  *Id*., Ex. D (Patajo Dep.) at 62.  In Patajo's email to Holliday she states, in part, as follows:

> Hi Emily!
>
> I'm writing to reach out to you for some advice on a store that you most recently supported for an AP-term hotline call.  . . .  You and I had a great discussion on the AP team at the store, and specifically spoke about a TPS named Ethan who may have warranted a term for behavior in January (aggressive behavior during an apprehension).
> I did not decide to go forward with any term for Ethan during June because we felt too much time had elapsed since January, and he had already been issued a final warning.  However, since that point Ethan has engaged in very concerning behavior, and I would like to take you as a partner to see what you think.

1

2          While attempting to execute a productive merchandise recovery,
           (PMR) he demonstrated aggressive behavior towards a subject.  He
3          broke an AP directive (on video, he walks and talks with the guest
           throughout the sales floor, as the subject tries to exit the building he
           blocks the exit, prompting her to remove items from her bag).
4          We are concerned with him blocking the exit, but also engaging in
           conversation.  We do not know exactly what was said (we cannot
5          hear through video).   He also omitted information on his TCM
           report (he did NOT include details about talking to her at the exit or
6          engaging in conversation. He does not say if she offered to remove
           the infamil [sic] product, or if he had a conversation with her.
7          However, on video he is clearly talking to the subject).  The concern
           is that he pursued a PMR instead of an apprehension.  If he did not
8          feel he had all 5 steps for an apprehension, he should not have
           approached the guest at all.

9   Emmert Decl., Ex. Z (email from Patajo to Holliday, cc'ed to Shavaun Burse, dated August 25,

10  2011 requesting Holliday's assistance).

11          At the time Patajo asked Holliday to investigate the baby formula incident, both were

12  aware of the January 4, 2011 incident in which Gwin was injured.  In particular, Holliday testified

13  that she had learned about the incident from Patajo in either June or August of 2011.  Reid Decl.,

14  Ex. 6 (Holliday Dep.) at 61-62.  Holliday testified that she was not aware, however, that Gwin

15  filed a claim for Workers' Compensation for that injury.  Emmert Decl., Ex. H (Holliday Dep.) at

16  31.  Nor would she have been able to find this information in Gwin's file on Target's computer

17  system, Holliday testified.  *Id.* at 32.  Patajo testified that she learned about the incident in "late

18  spring" of 2011.[7]  Reid Decl., Ex. 8 (Patajo Dep.) at 28.

19          Subsequently, Heather McCoy interviewed Gwin to learn more about the incident.

20  Emmert Decl., Ex. AA.  In her report to Emily Holliday, McCoy summarized Gwin's responses to

21  her questions as follows:

22          In the seek to understand I asked why Ethan was walking with the
           subject.  He explained to me that he was actually escorting her to the
23         door because when she saw him in infants she had started swearing
           at him.  He said the situation was not just a PMR but also he had
24         asked her to leave because of her behavior towards him and in front
           of guests.  He assured me that this is how he always escorts out
25         guests who are being disruptive out [sic].  He stays slightly in front
           of them or next to them so they don't feel that they are being
26         followed and see him at all times.

27  _____

28  [7] At oral argument, Target stipulated that Patajo had access to information about Gwin's Worker's
    Compensation claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

> I told him the video I observed quite a bit of conversation between him and the guest and I wondered what they were saying. He told me that she was asking him over and over if he was going to arrest her. He told me that each time he repeated to her what he has been rehearsed to say in this instance, "Target does not give me the ability to arrest those who are stealing but if however you have [any] questions I can get you our LOD."
>
> I asked him why he chose to PMR her instead of apprehending her if they always had line of sight. He stated that the dollar value was below the $100 amount that had been given to TPS as needed to make an apprehension.
>
> I asked him why he had stopped her at the door. Ethan stated that he had only gotten in front of her because she had chosen to exit through an entrance door and that an incoming guest with a cart had gotten in his way. He said as they approached the entrance she had asked him again if he was going to arrest her if she left the building. He stated to her again as he was crossing in front of her, "Target does not give me the ability to arrest those who are stealing but if however if you have [any] questions I can get you our LOD." [H]e said he turned around to face her as he was addressing her and she said, "Fine, here" and she opened her bag and pulled out a can of formula. He said she told him to look in her bag and he could see that there was still one more can of formula but because she did not offer it to him he did not mention it or grab it. So she exited with one can on her person.
>
> I asked him why he was missing so much of this information from his report. He said that [i]ts [sic] no excuse but he felt very rushed to get the report in. He had "pushed to talk" with the IC, and they asked him to get it in right away because they needed the case #. He said formula is involved in top alerts.
>
> He said that he and the investigator Don had a disagreement on the case and that Don was upset with Ethan for not apprehending the suspect. He said because it was a top alert subject that he should have disregarded the $ amount. But Ethan said he did not recognize her as a top alert subject.

*Id.* McCoy concluded her email by asking Holliday which AP Guideline Holliday believed Gwin might have broken. *Id.* She stated:

> These were the main points of our conversation. I can tell you that Ethan told me several times throughout the conversation that he did not break any directives. He felt confident in that. So if you do feel that he did can you please let me know which ones. We struggled to find something to clearly put this under. Many people told me that its just "common sense." I wish that were a directive : ) I didn't [sic] know if the fact that he omitted detail out of his report was enough. Please let me know your thoughts and thank you again for your help.

1   *Id*.  Similarly, in an email McCoy had sent to Holliday the previous day, she stated that she, Robin

2   Cribbs  and Christine Bliss "could not find an actual directive that was broken."  *Id*.

3           McCoy testified in her deposition that she made a recommendation to Patajo and Cribbs

4   that Gwin *not* be terminated.  Reid Decl., Ex. 4 (McCoy Dep.) at 67-68.  She also testified that one

5   of the reasons she did not believe he should be terminated was because the January 4, 2011

6   incident involved a failure to disengage when he should have and Gwin did not have any further

7   incidents involving a failure to disengage.  Reid Decl., Ex. 4 (McCoy Dep.) at 88-89.

8           On September 6, 2011, Emily Holliday recommended to Heather McCoy and Robin

9   Cribbs that Gwin be terminated.  Emmert Decl., Ex. BB (email from Emily Holliday to Robin

10  Cribbs and Heather McCoy also cc'ing Patajo and Burse).  In the email, Holliday gave three

11  reasons for her recommendation.  *Id*.  First, she cited the AP Directive prohibiting AP team

12  members from asking a subject to return concealed merchandise or making accusations of theft.

13  *Id*.  She notes, "although we cannot hear the conversation between Ethan and the subject, between

14  the instance of the two of them stepping into Cosmetics and also as she attempts to exit the store,

15  without reasonable doubt it appears he is requesting for her to return the formula."  *Id*.  Second,

16  she cites the directive requiring that if a guest initiates interaction with an AP team member, the

17  team member should identify himself and if the guest pursues the conversation, "refer the guest to

18  the STL or LOD for resolution."  *Id*.  On this policy, Holliday states, "Although Ethan clearly

19  states, multiple times, "Target does not give me the ability to arrest those who are stealing, but if

20  you have questions I can get you our LOD," based off the amount of conversing that was taking

21  place between the two of them, Ethan could have more proactively gotten a leader involved in the

22  situation.  He should not have had to repeat these sentences multiple times."  *Id*.  Finally, she cites

23  the requirement that "All incidents must be accurately documented within the TCM."  *Id*.  As to

24  this policy, Holliday stated that she had not seen Gwin's report but that "from what was shared,

25  there was a lot of detail lacking and the report doesn't accurately report what is shown on the

26  video."  *Id*.

27          On September 8, 2011, Heather McCoy called Gwin into her office and told him that his

28  employment was being terminated immediately because of alleged violations of Target's policies.

United States District Court
Northern District of California

18

JSUF ¶ 74.   McCoy testified in her deposition that she read the email from Holliday to Gwin "verbatim."  Supplemental Declaration of Benjamin A. Emmert in Support of Target Corporation's Motion for Summary Judgment or, Alternatively, Partial Summary Judgment to Plaintiff's First Amended Complaint ("Emmert Supp. Decl."), Ex. 2 (McCoy Dep.) at 113.   She further testified that although she had not known "where to put [Gwin's] termination under the [AP] Directives," Emily Holliday "laid them out for [her] and [she understood] the rationale behind what [Holliday] laid out."  *Id*. at 112.

McCoy offered three somewhat different accounts as to who made the decision to terminate Gwin.  First, she testified that the decision was made by Emily Holliday. Emmert Decl., Ex. F (MCoy Dep.) at 47.  Later she testified that she believed the decision was made jointly by Laura Patajo and Emily Holliday.  *Id*. at 69.  When asked again who was involved in the decision to terminate Gwin she answered that "[she] gave [her] recommendation and then Laura [Patajo] and Emily [Holliday] sent [her] the correct verbiage to use."  *Id*. at 111.  Patajo, in turn, testified that Emily Holliday did not make the decision to terminate Gwin as "she doesn't work at the store."  Emmert Decl., Ex. D (Patajo Dep.) at 70.  Rather, she testified, the decision was made by the store, which is "Robin and Heather" but they were "expected to partner with [Patajo] and Emily" in making the decision.  *Id*. Emily Holliday testified that she did not know who made the "ultimate decision" to terminate Gwin and that she only made a recommendation.  Reid Decl., Ex. 6 (Holliday Dep.) at 18.

**B.    Procedural Background**

This action was removed from Contra Costa Superior Court to this Court on November 26, 2012.  In the First Amended Complaint (the operative complaint),  Gwin  asserted claims for: 1) wrongful termination in violation of California Labor Code § 132a; 2) wrongful termination in violation of California Labor Code § 98.6; and 3) wrongful termination in violation of the public policy of the State of California.  Target brought a Motion for Judgment on the Pleadings to Plaintiff's First Amended Complaint  ("Motion for Judgment on the Pleadings") asserting that all of Gwin's claims failed, as a matter of law and therefore were subject to dismissal under Rule 12(c) of the Federal Rules of Civil Procedure.  As to Gwin's claim under § 98.6, Target argued,

*inter alia*, that the claim should be dismissed because Gwin was required to exhaust his

administrative remedies and because the California Worker's Compensation Appeals Board is the

exclusive forum for Gwin's claim.  In its September 27, 2013 Order, the Court addressed both

arguments at length and rejected them.  *See* Docket No. 32.  The Court concluded that both the §

98.6 claim and the claim for termination in violation of public policy were adequately pled but

dismissed the claim under California Labor Code § 132a with prejudice.  *Id.*

### C.    The Motion

Target seeks summary judgment on Gwin's two remaining claims, arguing that:1) Gwin

cannot establish the essential elements of his claim under California Labor Code § 98.6; and 2) to

the extent his claim for termination in violation of public policy is based on the alleged violation

of § 98.6, that claim fails as well.  Motion at 20, 33.  Target challenges Gwin's § 98.6 claim on the

grounds that: 1)  the claim falls within the exclusive jurisdiction of the Workers' Compensation

Appeals Board; 2) Gwin did not exhaust his administrative remedies; and 3) there is no genuine

dispute of fact as to whether Target terminated Gwin for filing Workers' Compensation Claims.

Motion at 20-32.  The Court has already rejected the first two arguments, as discussed above.  To

the extent Target's arguments amount to a request that the Court reconsider its previous rulings,

Target has failed to adhere to Civil Local Rule 7-9.[8] Therefore the Court addresses only the third

argument.[9]

---

[8] Pursuant to Civ.L.R. 7-9, a party seeking reconsideration must first ask the Court for leave to file
a motion for reconsideration, which Target did not do.  Further, the rule provides that "[n]o motion
for leave to file a motion for reconsideration may repeat any oral or written argument made by the
applying party in support of or in opposition to the interlocutory order which the party now seeks
to have reconsidered." Civ.L.R. 7-9(c) (emphasis added).  Target's Motion violates this rule as
well, repeating arguments the Court expressly rejected and even citing the *Creighton I* decision,
despite the Court's admonishment in its previous order that Target affirmatively misrepresented
the law by citing that case without acknowledging that the judge in that case subsequently
reconsidered and reached the opposite result.  *See* Docket No. 32 at 18-19, n. 1.  While Rule 7-
9(b) sets forth limited exceptions to the rule that parties may not reargue issues that the court has
already decided, Target did not address these requirements.  Rather, in its Reply brief, Target
boldly proclaims there "is no law or Court rule precluding Target" from raising these issues again.
Reply at 2.  Target is incorrect.
[9] The Court also notes that Target's Motion exceeded the page limit set for motions filed in this
Court by eight pages.  *See* Civ.L. R. 7-4(b) ("[u]nless the Court expressly orders otherwise
pursuant to a party's request made prior to the due date, briefs or memoranda filed with opposition
papers may not exceed 25 pages of text . . .").  Target did not seek prior leave to exceed the
Court's page limit.  Although the Court will consider the Motion despite the failure of Target's

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Applying the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*,

2   411 U.S. 792, 802-803 (1973), Target contends Gwin's evidence is insufficient to make a prima

3   facie case of retaliation, that it has established that it terminated Gwin for a legitimate, non-

4   discriminatory reason, and that Gwin cannot show that the reason offered by Target is pretextual.

5   *Id.* at 25-32.

6    As to the prima facie case, Target argues that the only legally cognizable adverse

7   employment action in this case is Gwin's termination, in September 2011, and Gwin cannot show

8   that Target's action was in response to Gwin's filing of Workers' Compensation claims because 1)

9   the undisputed facts show that the person who recommended Gwin's termination, Emily Holliday,

10   was unaware that Gwin had engaged in protected activity (namely, filing Workers' Compensation

11   claims); and 2) Gwin's termination, which occurred over eight months after he filed his second

12   Worker's Compensation claim, is too attenuated in time to establish causation. *Id.* at 26-30.

13   Target further contends it has articulated a legitimate, non-discriminatory reason for terminating

14   Plaintiff. *Id.* at 30. Target argues that the relevant question is not whether its decision was based

15   on "correct assumptions, but whether Target reasonably believed those reasons and validly

16   exercised its business judgment based on them." *Id.* at 30-31. According to Target, it reasonably

17   believed Gwin violated the AP Directives. *Id.* at 31. In support of this position, Target has

18   submitted a declaration by Senior Investigator Don Hanlon setting forth, based on his review of

19   the relevant surveillance video, what he believes are the AP Directives Gwin violated in

20   connection with the January 4, 2011 incident and the baby formula incident. *See* Declaration of

21   Don Hanlon in Support of Target Corporation's Motion for Summary Judgment or, Alternatively,

22   Partial Summary Judgment ("Hanlon Decl."). Finally, Target argues Gwin cannot show that

23   Target's reason for terminating him is pretext because he has no evidence of pretext. *Id.* at 32.

24   According to Target, evidence about whether Gwin *in fact* violated the AP Directives is not

25   sufficient to establish pretext. *Id.*

26

27

28   counsel to adhere to the requirements of the Local Rules, the Court will reject any future filings
that do not comply with the Local Rules.

United States District Court
Northern District of California

### D.    Opposition

Gwin contends in his Opposition the evidence is sufficient to demonstrate a fact question as to whether Target discriminated against him for engaging in protected activity.  Opposition at 21.

First, he cites the conversation he had with Christine Bliss, who allegedly warned Gwin not to get injured again because district level management was looking for a reason to fire Gwin, as direct evidence of discriminatory animus.  *Id.* at 9-10.

Second, he argues that even where a long period of time elapses between the protected activity and the adverse act, an inference of causation may be found "'if between the events the employer engages in a pattern of conduct (e.g., hostile treatment, exclusion from meetings) consistent with a retaliatory intent.'"  *Id.* at 22 (quoting *Wysinger v. Automobile Club of Southern California*, 157 Cal. App. 4th 413, 412 (2007); and citing *Green v. Laibco, LLC*, 192 Cal. App. 4th 441, 456 (2011); *Burlington Northern & Santa Fe Ry Co. v. White*, 548 U.S. 53, 71 (2006); *Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 208-209 (2nd Cir. 2006); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997)).  There is evidence of such a pattern of conduct in this case, Gwin contends, citing  the alleged changes in his treatment by Target (set forth in the Gwin Declaration) that began after his first injury with respect to his assignments and the level of scrutiny to which his performance was subjected.  *Id.* at 23.

Third, Gwin contends the length of time between the time when Patajo and Holliday *learned*  that he engaged in protected activity (at the earliest in May or June of 2011, according to Gwin) and his termination – less than four months – instead of negating causation, as Target contends, actually supports an inference of causation.  *Id.* (citing *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 507 (9th Cir. 2000)).

Fourth, Gwin argues that there is a genuine dispute of fact as to pretext.  *Id.*  According to Gwin, "[p]retext may be found where the employer has given shifting, contradictory, implausible, uninformed or baseless justifications for its actions."  *Id.* (citing *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994); *Guz v. Bechtel Nat'l, Inc*., 24 Cal. 4th 317, 363 (2000)).   Gwin cites the Supreme Court's holding in *Reeves v. Sanderson Plumbing Products, Inc.* that "the trier of fact

22

1  can infer from the falsity of the explanation that the employer is dissembling to cover up a

2  discriminatory purpose." *Id*. at 24 (citing 530 U.S. 133, 147 (2002)).  Gwin contends this case

3  presents "a classic example of such contradictory and implausible explanations from the defendant

4  that they can only be construed as covering up a discriminatory purpose." *Id*. at 24.

5        Gwin cites four examples to show that Target's allegedly shifting and implausible reasons

6  for terminating him demonstrate pretext .[10]  First, Gwin points to the initial suggestion that his

7  actions with respect to the baby formula incident were improper because he engaged in

8  "aggressive conduct." *Id*.; *see also* Emmert Decl., Ex. Z (email from Patajo to Holliday, cc'ed to

9  Shavaun Burse, dated August 25, 2011 requesting Holliday's assistance).  According to Gwin, the

10  "implausibility of this accusation is obvious from a review of the 8/11/11 baby formula PMR

11  video." *Id*.; *see also* Emmert Decl., Ex. HH (video).

12        Second, Gwin argues that Target failed to mention that Heather McCoy "found Plaintiff

13  committed absolutely no violations of any AP Directives in performing the baby formula PMR."

14  *Id*.;  *see also* Emmert Decl., Ex. AA (email from Heather McCoy to Emily Holliday stating she

15  was unable to determine which AP Directive might have been violated); Reid Decl., Ex. 4

16  (McCoy Dep.) at 67 (McCoy testimony that she recommended against terminating Gwin).

17        Third, Gwin contends Target violated its own Counseling and Corrective Action policy in

18  deciding to terminate Gwin. *Id*. ;  *see also* Reid Decl., Ex. 1 (Counseling and Corrective Action

19  Policy).  Specifically, Gwin contends the reasons for his termination cited by Holliday were not

20  sufficient to warrant termination under the Counseling and Corrective Action policy because they

21  were a not the same type of "conduct" of which he was accused in the final warning.  Opposition

22  at 18 (citing Reid Decl., Ex. 1) at TARGET0362-0379.  He contends this is one of the reasons

23  McCoy said she disagreed with the recommendation to terminate Gwin.  *Id*. at 19 (citing Reid

24  Decl., Ex. 4 (McCoy Dep.) at 88-89).  Further, Gwin asserts, the violations he allegedly

25  _____

26  [10]Gwin does not identify the specific evidence supporting his examples in this section of his brief,
    leaving the Court to guess as to which evidence he bases his claims upon.  The citations to the

27  evidence provided here are, therefore, based on the Court's best guess as to the evidence at issue.
    While the Court should not be required to scour the record to find evidentiary support for

28  Plaintiff's arguments, it also notes that Plaintiff provided a detailed description of the evidence
    with complete citations to the record earlier in his brief.

1    committed in handling the baby formula incident were considered "minor offenses" under Target's

2    policy and therefore, the correct progression of corrective actions is counseling for the first

3    offense, final warning for the second offense, then termination, which Target did not follow.  *Id.*

4    (citing Reid Decl., Ex. 1) at TARGET0372-0374.

5        Finally, Gwin points to the Declaration of Don Hanlon to establish pretext.  *Id.* at 24.

6    Gwin contends Target has submitted the Hanlon Declaration, which includes alleged violations of

7    the AP Directives that were not raised at the time of the relevant incidents, because it "knows that

8    Plaintiff's termination is not supported by the facts [it] relied upon" and is now "try[ing] to

9    convince the Court that Plaintiff should have been terminated anyway, even if Target didn't have a

10   legitimate reason to do so for the baby formula PMR."  *Id.*  Gwin also objects to the Hanlon

11   Declaration on the basis that it is irrelevant, prejudicial and contains improper opinion testimony,

12   citing Federal Rules of Evidence 401, 403, 404, 602, 701 and 702.  Opposition at 1-2.[11]

**E.    Reply**

13

14       In its Reply brief, Target reiterates its position that Gwin cannot make a prima facie case of

15   retaliation or demonstrate pretext.  Reply at 6-15.  With respect to the prima facie case, Target

16   argues that the cases cited by Gwin to show retaliatory intent based on a pattern of conduct do not

17   support his position because all of them involved plaintiffs who were "subjected to treatment that

18   materially adversely affected their chances for promotion."  *Id.* at 8 (citing *Wysinger v.*

19   *Automobile Club of Southern California*, 157 Cal. App. 4th 413, 412 (2007); *Green v. Laibco,*

20   *LLC*, 192 Cal. App. 4th 441, 456 (2011); *Burlington Northern & Santa Fe Ry Co. v. White*, 548

21   U.S. 53, 71 (2006); *Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 208-209

22   (2nd Cir. 2006); *Kim v. Nash Finch Co*., 123 F.3d 1046, 1060 (8th Cir. 1997)).  Target also argues

23   that Gwin failed to respond to Target's assertion that there can be no causation because the

24   undisputed facts show that Holliday was not aware of either of Plaintiff's Workers' Compensation

25   claims.  *Id.* at 9.  Nor does Gwin point to any evidence that would give rise to a factual dispute on

26

27   ───────────────

     [11] For the purposes of summary judgment the Court considers the Hanlon Declaration.  However,
28   the Court reserves for trial the question of whether Hanlon's testimony is admissible under the
     Federal Rules of Evidence cited by Plaintiff.

United States District Court
Northern District of California

this question, Target contends.  *Id.*

Target also rejects Gwin's arguments relating to whether the reason given for terminating him was pretext.  *Id.* at 12-15.  First, it asserts that its reasons for terminating Gwin have never changed and that Gwin's reliance on the email from Patajo to Holliday referencing "aggressive conduct" does not show that Target gave inconsistent reasons for his termination because the email was sent before Target made the decision to terminate him.  *Id.* at 12 (citing Emmert Decl., Ex. Z).

Second, it argues that Gwin mischaracterizes Heather McCoy's testimony to the extent he contends she found that Gwin did not violate the AP Directives.  *Id.* at 13.  According to Target, McCoy merely testified that she had difficulty understanding how Gwin violated the directives but that she ultimately understood the reasons for his termination and accepted Holliday's recommendation.  *Id.* (citing Supplemental Declaration of Benjamin A. Emmert in Support of Target Corporation's Motions for Summary Judgment or, Alternatively, Partial Summary Judgment to Plaintiff's First Amended Complaint ("Emmer Supp. Decl."), Ex. 2 at 69, 112).  At most, Target asserts, McCoy had a personal, subjective belief Gwin should not be terminated, but that belief does not establish Target did not believe Gwin had not violated the AP Directives because McCoy accepted the recommendation of Emily Holliday and carried out the termination.  *Id.* (citing Emmert Supp. Decl., Ex. 2 (McCoy Dep.) at 112-113.  Target also cites McCoy's testimony that Holliday made the decision to terminate Gwin.  *Id.* (citing Emmert Supp. Decl., Ex. 2 (McCoy Dep.) at 47.

Third, Target denies it violated its own Counseling and Corrective Action policy.  *Id.* at 13-14. Target cites evidence that Gwin was an at-will employee and therefore could be terminated for violation of the AP Directives.  *Id.* at 13-14.  It also points to language in the Counseling and Corrective Action policy expressly stating that it did not alter the at-will status of team members. *Id.* at 14 (citing Reid Decl., Ex. 1).  Target further argues that the policy cannot limit Target's rights and ability to terminate Gwin because Gwin was never given a copy of the document or made aware of its existence.  *Id.* (citing Emmert Decl., Ex. 1 (Gwin Dep.) at 24-24, Emmert Supp. Decl., Ex. 1 (Holliday Dep.) at 39-40).  Moreover, Target asserts, Gwin cannot establish that his

25

1    termination violated the Counseling and Corrective Action policy because Target's records

2    showed he was on a Final Warning Corrective Action and therefore any violation of Target's AP

3    Directives could result in immediate termination.  *Id*. (citing Emmert Supp. Decl., Ex. 1 (Holliday

4    Dep.) at 65-66).  According to Target, because Gwin violated the AP Directives on August 11,

5    2011, his termination was in "complete accord" with its policies.  *Id*.

6         Finally, Target rejects Gwin's reliance on the Hanlon Declaration to establish pretext,

7    arguing that Hanlon's opinions are "in complete accord with Target's stated reasons for

8    terminating his employment."  *Id*. at 15.  Target does not address Gwin's evidentiary objections to

9    the Hanlon Declaration.  *Id*.

## III.    ANALYSIS

### A.    Rule 56

12        Summary judgment on a claim or defense is appropriate "if the movant shows that there is

13   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

14   law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

15   the absence of a genuine issue of material fact with respect to an essential element of the non-

16   moving party's claim, or to a defense on which the non-moving party will bear the burden of

17   persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

18   made this showing, the burden then shifts to the party opposing summary judgment to designate

19   "specific facts showing there is a genuine issue for trial."  *Id*.  "[T]he inquiry involved in a ruling

20   on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof

21   that would apply at the trial on the merits."  *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 252

22   (1986).  On summary judgment, the court draws all reasonable factual inferences in favor of the

23   non-movant.  *Id*. at 255.

### B.    California Labor Code § 98.6 Claim

#### 1.    Legal Standard

26        Gwin asserts a claim for retaliation under California Labor Code § 98.6(a), which provides

27   as follows:

28              No  person  shall  discharge  an  employee  or  in  any  manner
                discriminate  against  any  employee  or  applicant  for  employment

United States District Court
Northern District of California

1

2

3

4

5

6

> because the employee or applicant engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the employee or applicant for employment has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to his or her rights, which are under the jurisdiction of the Labor Commissioner, or because the employee has initiated any action or notice pursuant to Section 2699, or has testified or is about to testify in any such proceeding or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her.

7   Cal. Labor Code § 98.6(a).  In its order on Target's Motion for Judgment on the Pleadings, the

8   Court found that Gwin's claim survived to the extent it was based on the third clause of this

9   section.  *See* Docket No. 32 at 12-17.  Gwin's theory is that Target retaliated against him for

10  exercising his rights under California Labor Code § 132a.  Section 132a(1) provides that:

11

12

13

14

15

16

> (1) Any employer who discharges, or threatens to discharge, or in any manner discriminates against any employee because he or she has filed or made known his or her intention to file a claim for compensation with his or her employer or an application for adjudication, or because the employee has received a rating, award, or settlement, is guilty of a misdemeanor and the employee's compensation shall be increased by one-half, but in no event more than ten thousand dollars ($10,000), together with costs and expenses not in excess of two hundred fifty dollars ($250). Any such employee shall also be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer.

17  Cal. Labor Code § 132a.  Thus, the protected activity at issue in this case is Gwin's right to be free

18  from retaliation for filing a claim for Workers' Compensation or expressing an intention to file

19  such a claim.

20          In their briefs, the parties have applied the approach that is applied by California courts to

21  retaliation claims in other contexts.  The Court agrees that this is the correct approach for

22  evaluating Gwin's claim under § 98.6.  *See Franklin v. Sacramento Area Flood Control Agency*,

23  2009 WL 2399569, at *18 (E.D.Cal., April 29, 2009) ("Though the parties have not identified, nor

24  is the court aware of, applicable law on the elements or methods to prove a claim for retaliation

25  under section 98.6 of the California Labor Code, the court will apply the same burden-shifting

26  analysis to plaintiff's state law claim, since California law tracks federal standards in other areas

27  of labor law, *see Serv. Employees Int'l Union, Local 250 v. Colcord*, 160 Cal.App.4th 362, 370, 72

28  Cal.Rptr.3d 763 (2008) (noting that the Industrial Welfare Commission and Division of Labor

27

United States District Court
Northern District of California

1    Standards Enforcement follow federal standards)");  *see also Hollie v. Concentra Health Services,*

2    *Inc.*, 2012 WL 993522, at * 4 (N.D. Cal. Mar. 23, 2012)(applying burden-shifting approach to

3    claim for retaliation under Cal. Labor Code § 98.6)).

4            "California has adopted the three-stage burden-shifting test established by the United

5    States Supreme Court for trying claims of discrimination . . . based on disparate treatment." *Guz*

6    *v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000) (citing, *inter alia*, *McDonnell Douglas Corp. v.*

7    *Green* 411 U.S. 792 (1973)).  The *McDonnell Douglas* test places the initial burden on the

8    plaintiff to establish a prima facie case of retaliation.  *Hollie*, 2012 WL 993522, at * 4.  If the

9    plaintiff makes a prima facie case, the burden shifts to the defendant to articulate a legitimate,

10   nondiscriminatory reason for its conduct.  *Id.*  If the defendant articulates a legitimate, non-

11   discriminatory reason for its conduct, the burden then shifts back to the plaintiff to show that the

12   reason the defendant has offered is a pretext to cover up its unlawful discrimination.  *Id.*  "To

13   show pretext, a plaintiff may rely on evidence offered to establish the prima facie case, as well as

14   on other evidence and effective cross-examination of defense witnesses." *Miller v. Fairchild*

15   *Industries, Inc.*, 885 F.2d 498, 505 n. 8 (9th Cir. 1989) (holding that district court erred in failing

16   to consider whether timing of adverse conduct – which it had found supported the plaintiff's prima

17   facie case – also provided evidence sufficient to show pretext on summary judgment); *see also*

18   *DeJung v. Superior Court,* 169 Cal. App. 4th 533, 554 (2008) ("the same evidence can be used

19   both to set forth a prima facie case of discrimination, and to demonstrate the existence of a triable

20   issue of fact on the issue of pretext").

21          The *McDonnell Douglas* test was developed for situations in which a plaintiff does not

22   have direct evidence of retaliatory intent; therefore the test does not apply where there is direct

23   evidence.  *See Trop v. Sony Pictures Entertainment Inc.*, 129 Cal.App.4th 1133, 1144 (2005)

24   (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985)).  Direct evidence is

25   evidence that proves a fact without inference or presumption.  *Id.*  In more colorful language, "[i]t

26   is 'smoking gun' evidence, which is tantamount to an admission by the decision maker that the

27   adverse employment decision was based on" discriminatory animus.  *Evans v. Sears Logistics*

28   *Services, Inc.,* 2011 WL 6130885, at *8 (E.D.Cal. Dec. 8, 2011) (applying California law in an age

1  discrimination action). "Comments demonstrating discriminatory animus may be found to be

2  direct evidence if there is evidence of a causal relationship between the comments and the adverse

3  job action at issue." *DeJung v. Superior Court*, 169 Cal. App. 4th at 550.

### 2.   Whether There is Direct Evidence of Retaliatory Intent

5  Gwin contends the statements made by Christine Bliss – warning him not to get injured

6  again because district level management was looking for a reason to terminate him – constitute

7  direct evidence of Target's retaliatory intent.  The Court disagrees.

8  As discussed above, evidence is direct if it proves a fact without requiring that any

9  inference be drawn.  For example, in *DeJung*, the court found that there was direct evidence of

10  discriminatory animus that precluded summary judgment in an age discrimination case involving

11  failure to hire where the plaintiff presented evidence that the head of the hiring committee had

12  stated that the committee "want[ed] somebody younger, maybe in their 40's."  169 Cal. App. 4th

13  at 550.  In contrast,  in *Evans*, also an age discrimination case, statement by the plaintiff's

14  supervisor that Sears needed "fresh blood" and that the plaintiff would not be around much longer

15  because he had reached retirement age were found to be insufficient to constitute direct evidence

16  of discriminatory animus.  2011 WL 6130885, at *2.  The court reasoned that these statements

17  "[did] not prove, without inference or presumption, that [the supervisor] intended to terminate [the

18  plaintiff] based on his age" because she might have meant that the plaintiff was going to

19  *voluntarily* retire. *Id*. at *9.   Similarly, the statements by Bliss, assuming they are attributable to

20  Target, require at least one inference to be drawn to establish that Target terminated Gwin for

21  engaging in protected activity.  In particular, the inference must be drawn that Target did not want

22  Gwin to get injured again *because* Gwin had filed claims for his past injuries and Target did not

23  want him to file any further Workers' Compensation claims (as opposed, for example, to wanting

24  to maintain a safe environment for employees and guests).  In other words, the statements by Bliss

25  are not the sort of "smoking gun" evidence that is sufficient to render the *McDonnell Douglas* test

26  inapplicable.

### 3.   Prima Facie Case

28  Because there is no direct evidence of retaliatory intent, the Court applies the *McDonnell*

United States District Court
Northern District of California

1    *Douglas* test, which requires that Gwin meet the initial burden of establishing a prima facie case of

2    discrimination.  The Court finds that Gwin has met this burden.

3            "In order to establish a prima facie case of retaliation . . . a plaintiff must show (1) he or

4    she engaged in a protected activity, (2) the employer subjected the employee to an adverse

5    employment action, and (3) a causal link existed between the protected activity and the employer's

6    action."  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042 (2005) (citations omitted).  It is

7    undisputed that Target subjected Gwin to an adverse employment action when it terminated him.

8    It is also undisputed that Gwin filed claims for Workers' Compensation after he was injured in

9    January 2010 and again in January 2011.  Thus, the only question is whether Gwin can show

10   causation, either based on what Gwin contends is a pattern of retaliatory conduct or the timing of

11   his termination.

12           An inference of causation may arise based on the timing of an adverse employment action.

13   *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 507 (9th Cir. 2000)

14   ("when adverse employment decisions are taken within a reasonable period of time after

15   complaints of discrimination have been made, retaliatory intent may be inferred").  In particular,

16   where an adverse employment action occurs "close on the heels" of the protected activity, the

17   timing alone may be sufficient to support an inference of causation.  *Ray v. Henderson*, 217 F.3d

18   1234, 1244 (9th Cir. 2000) (holding on summary judgment that causation could be inferred based

19   on timing of adverse employment actions).  Even where the time that elapses between the

20   protected activity and the adverse employment action is not short enough to support an inference

21   of causation, however, a plaintiff may demonstrate causation "if between these events the

22   employer engages in a pattern of conduct consistent with retaliatory intent."  *Wysinger v.*

23   *Automobile Club of Southern California*, 157 Cal. App. 4th 413, 421 (2008).  "[T]he collective

24   impact of a series of retaliatory acts may constitute sufficient adverse employment action even if

25   some of the acts individually would not."  *Id.* at 421 (holding that undeserved negative job

26   reviews, reductions in staff , ignoring the plaintiff's health concerns, and "acts that caused the

27   plaintiff substantial psychological harm" constituted "a pattern of conduct, the totality of which

28   constitute[d] and adverse employment action"); *see also Green v. Laibco, LLC*, 192 Cal. App. 4th

United States District Court
Northern District of California

441, 455-456 (2011).

In *Green*, the plaintiff, who worked in the activities department of a convalescent hospital, met with her supervisor to complain about sexual harassment by a coworker. *Id*. at 455.  She testified that after the meeting she did not receive the support she needed, that she had "difficulty getting assistance in many areas," that it was "hard to get refreshments from the kitchen, and residents known to be disruptive would be placed in the activities department." *Id*.  She also testified that when she complained to management that she felt her treatment was in retaliation for reporting the harassment, she was criticized for reporting it. *Id*.  Ultimately, she was terminated. *Id*.  The court of appeals found that this evidence was sufficient to support the jury's verdict in favor of the plaintiff. *Id*. at 456.  In particular, the court held that the evidence, viewed in the light most favorable to the plaintiff, "showed that various sorts of retaliatory conduct began immediately after her complaint and persisted until her employment ended" and that "[f]rom this a jury could reasonably infer that plaintiff's complaint about . . . sexual harassment was a motivating factor in her later termination." *Id*.

While an inference of causation may arise based on timing or a pattern of conduct, such an inference can arise only where the evidence, construed in favor of the plaintiff, shows that "the employer was aware that the plaintiff had engaged in the protected activity. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  Thus, in *Cohen*, the court held in a Title VII retaliation case that there was no causation where the evidence established that the supervisor who made the decision to demote the plaintiff was unaware that the plaintiff had filed an EEOC complaint and there was "no evidence that any company official or employee who had knowledge of [the plaintiff's] complaint had any part in the policy decision." *Id*.  However, where multiple individuals are involved in the relevant decision, the plaintiff "need not demonstrate that every individual who participated in the [adverse employment action] shared discriminatory animus in order to defeat a summary judgment motion." *DeJung v. Superior Court*, 169 Cal.App.4th at 550.  The court in *DeJung* explained, "an individual employment decision should not be treated as a watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from every other decision." *Id*. (citations and quotations omitted).  "Thus, showing that

31

a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." *Id.*

This principle is illustrated in *Wysinger.*  In that case, the plaintiff, Wysinger, allegedly was denied a promotion after he filed an EEOC complaint of age discrimination.  157 Cal. App. 4th at 418.  Subsequently, his work environment changed;  he was "no longer invited to be on management committees or to apply for management positions" and he was "treated coldly and ignored at management meetings."  *Id.*  Ultimately, he was denied a promotion he had requested. *Id.* at 419.   The ultimate decision maker was a senior vice president of the employer, McDonald, but there was evidence that McDonald often relied on the advice of a local vice president of the company, Kane, and that he had followed Kane's final recommendation as to the decision to deny the plaintiff the requested promotion.  *Id.*  Kane was aware that the plaintiff had filed an EEOC complaint and there was evidence of discriminatory animus as to Kane.  *Id.*  McDonald – the final decision maker – was unaware of the EEOC complaint.  *Id.*  Nonetheless, the court rejected the employer's argument that a jury could not reasonably infer a retaliatory motive on the part of the employer because McDonald was unaware of the EEOC claim.  *Id.*  First, the court held that "the jury could reasonably infer that anyone in [McDonald's] position would know about the EEOC complaint because of its financial impact on the company."  *Id.*  Even if McDonald was unaware of the complaint, though, the court held that the evidence was sufficient to show a retaliatory motive on the part of the employer.  *Id.*  The court reasoned as follows:

> [A] decision maker's ignorance does not "categorically shield the employer from liability if other substantial contributors to the decision bore the requisite animus. . . . " If he participated in the decision, jurors may infer animus.  . . . Because Kane was a motivating force in the selection, his animus is imputed to ACSC.

*Id.* (citations omitted).

Here, Gwin has not pointed to affirmative testimony by any of the individuals involved in his termination – Patajo, Holliday, McCoy, or Cribbs – that they were aware that Gwin filed a claim for Workers' Compensation.  However it is undisputed that "Target walked Plaintiff through

32

the Workers Compensation Benefits process" after each of his injuries.  JSUF ¶ 65.  While it is not clear which specific manager walked Gwin through the Workers' Compensation process, to the extent it has been stipulated that "Target" walked Plaintiff through the Workers' Compensation process, it is reasonable to attribute to the employer knowledge of Gwin's intentions.  Target also does not dispute that when an employee files a claim for Worker's Compensation the claim goes to Human Resources and the employee's manager also receives notice of the claim.  This evidence is sufficient to support a reasonable inference that Target management (including the individuals involved in making the decision to terminate Gwin) knew that Gwin intended to file claims for Workers' Compensation based on both injuries and that he did, in fact, file claims for those injuries.  Therefore, the Court concludes that the evidence, viewed in the light most favorable to Gwin, is sufficient to support an inference that Target was aware that Gwin at least intended to file claims for Workers' Compensation for both of his injuries while employed by Target.

The Court further finds that there is evidence from which a jury could reasonably conclude that Target engaged in a pattern of retaliatory conduct after Gwin filed his claims for Workers' Compensation.  In particular, like the plaintiffs in *Wysinger* and *Green*, Gwin testified that he was treated less favorably after he filed his claims by being posted in less desirable locations, being precluded from going into the surveillance room, having to ask to use the restroom, and being subjected to a higher level of scrutiny.  This evidence is sufficient to make a prima facie case that Gwin's termination by Target was in retaliation for his filing of (or intention to file) Workers' Compensation claims after his two injuries.

### 4.  Pretext

Target contends it had a legitimate, non-discriminatory reason for terminating Gwin, namely, its reasonable belief based on a valid exercise of business judgment that Gwin had violated its AP Directives.  It is undisputed that this reason is sufficient to shift the burden back to Gwin to show pretext.  Further, the Court finds that Plaintiff has produced sufficient evidence of pretext to survive summary judgment.

To show that Target's reason for terminating him is pretext and survive summary judgment, Gwin must produce enough evidence to show that either: 1) the alleged reason for his

33

1   discharge was false, or 2) that the true reason for his discharge was based on retaliatory animus.

2   *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (1997).  "[I]n an appropriate case, an

3   inference of dissembling may arise where the employer has given shifting, contradictory,

4   implausible, uninformed, or factually baseless justifications for its actions." *Guz v. Bechtel Nat.*

5   *Inc.*, 24 Cal.4th 317, 363 (2000); *see also E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.

6   1994) (holding in an age discrimination case that where the employer's testimony at trial

7   addressing the reasons for its decision differed from its initial response to the state's investigation

8   of the alleged discrimination, "a reasonable juror could infer that the explanations given by [the

9   employer] at trial were pretextual, developed over time to counter the evidence suggesting age

10  discrimination uncovered by the state investigation").  "[B]ecause of the inherently factual nature

11  of the inquiry, the plaintiff need produce very little evidence of discriminatory motive to raise a

12  genuine issue of fact" as to pretext.  *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991).

13          Plaintiff has presented evidence from which a jury could reasonably conclude the reason

14  offered for Gwin's discharge are false.  First, Gwin has offered testimony that Bliss expressly told

15  him that he should not get injured again because Target's district-level management was looking

16  for reasons to fire him.  *See*  Emmert Decl., Ex. A (Gwin Dep.) at 96-97; Gwin Decl., ¶ 16.  This

17  evidence alone is sufficient to create a fact question as to Target's motives.

18          But there is additional evidence that the proffered reason is false.  Gwin has offered

19  evidence that the Corrective Action Final Warning for the January 4, 2011 incident was not issued

20  until August 2011, months after the incident occurred, when he was asked to back-date the form.

21  Gwin Decl., ¶ 17.  Target relies on the Corrective Action Final Warning to show that it's

22  termination of Gwin was consistent with its Counseling and Corrective Action policy.  *See* Reply

23  at 14.  However a juror, drawing all reasonable inferences in favor of Gwin, could conclude from

24  this evidence that Target sought to use the January 4, 2011 incident simply to provide an excuse

25  for terminating Gwin based on the alleged violations that occurred during the baby formula

26  incident.   A juror might also draw this inference from Don Hanlon's Declaration, which sets forth

27  six AP Directives Gwin allegedly violated during the January, 2011 incident.  *See* Hanlon Decl.,

28  ¶¶ 10-22.  As only one of these reasons– the failure to disengage – was cited in the Corrective

United States District Court
Northern District of California

1   Action, a jury could reasonably conclude that the lengthy list of violations offered after-the-fact is

2   merely an attempt to bolster Target's case and had nothing to do with Target's actual motivation in

3   issuing the Final Action.[12]

4          Finally, there are fact questions as to pretext because a reasonable juror could conclude

5   that at least two of the three reasons offered by Holliday for recommending termination of Gwin

6   are, arguably, implausible.  *See* Emmert Decl., Ex. BB.  First, Holliday states that although there is

7   no audio on the surveillance video, "without reasonable doubt it appears he is requesting for [the

8   Subject] to return the formula."  *Id*.  Having viewed the video, the Court finds nothing that renders

9   this version of events more plausible than Gwin's account of the conversation (according to Gwin

10  he made no such request).  *See* Emmert Decl., Ex. HH. Certainly nothing in the video supports

11  Holliday's belief "without reasonable doubt."   Second, Holliday recommends termination based

12  on the lack of detail in Gwin's report  – and alleged inaccuracies – but notes that she has not seen

13  the report and is relying on what unidentified others had "shared" with her. Emmert Decl., Ex. BB.

14  A jury could reasonably infer from Holliday's speculation as to what was said during the baby

15  formula incident and her failure to actually review Gwin's report herself that the reasons she cites

16  for recommending Gwin's termination are merely pretext.[13]

**IV.   CONCLUSION**

17

18          For the reasons stated above, the Court finds that there are genuine issues of material fact

19  as to whether Target's termination of Gwin violated Cal. Labor Code § 98.6.  Because Gwin's

20

21

22

23  [12] The Court rejects Target's argument that the Court may not consider the Counseling and
    Corrective Action policy because Gwin was an at-will employee.  Gwin does not contend the
24  Corrective Action and Counseling policy gave rise to any contractual obligation on Target's part
    that would have altered his at-will status.  Rather, this evidence goes to whether the non-
25  discriminatory reason offered by Target is merely a pretext for retaliation.  Target has cited no
    authority suggesting that in that context the Court may not consider an employer's written
26  policies, even if they are merely nonbinding guidelines.
    [13] Gwin also argues that Target offered inconsistent explanations as to the reason he was
27  terminated for the baby formula incident.  Gwin relies on the suggestion in Patajo's email that
    Gwin was aggressive during the baby formula incident. As that email did not purport to provide a
28  definitive list of reasons for terminating Gwin and was sent to Holliday at the outset of the
    investigation, this argument is not persuasive.

United States District Court
Northern District of California

claim for wrongful termination in violation of public policy is based on his alleged violation of §

98.6, that claim survives summary judgment as well.  Accordingly, the Motion is DENIED.

**IT IS SO ORDERED**


Dated: February 19, 2014


_____
JOSEPH C. SPERO
United States Magistrate Judge